CHARLES C. HAVENS et al.

*v.*

SAMUEL S. OSBORN et al.

Where alterations and interlineations in a deed, prejudicial to the grantor, are claimed to have been fraudulently made, and the grantee admits that he made them after the deed was executed, but alleges that he did so with the knowledge and consent of the grantor, the burden of proof rests on the grantee.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. Charles Haight,* for complainants.

*Mr. William H. Vredenburgh,* for defendants.

THE CHANCELLOR.

This suit is brought by the heirs-at-law of Cortenius S. Havens, deceased, late of the county of Monmouth, against the

heirs-at-law of Abraham S. Osborn, deceased, late of that county, for relief against an alleged fraudulent alteration of a deed of conveyance, made by Havens and wife to Osborn, dated June 18th, 1845, by which, for the consideration of $10, as expressed in the deed, the grantors conveyed certain lands in Monmouth county.

The complainants allege that the deed, as originally drawn, conveyed only certain cedar swamp, and that since its delivery, it has been altered without the knowledge or consent of the grantors, so as to purport to convey also certain lands belonging to Havens's wife (who was also the owner of the cedar swamp) on Manasquan Beach.

Havens died August 3d, 1864. His widow is also dead. She died in 1871. Osborn died November 21st, 1865, leaving a last will and testament, by which he devised lands, but made no mention of the beach property in question. He did not devise it specifically, nor does his will contain any residuary clause. After his death, and in 1876, his son, Samuel S. Osborn, obtained a conveyance from his other heirs-at-law of all their undivided shares and interests in the property in question. The Havens deed was not then on record, and was not recorded until March 15th, 1878. That deed was drawn by Samuel S. Osborn; its execution was witnessed by John S. Forman, now deceased, who also, as a judge of the court of common pleas of the county, took the acknowledgment. It was acknowledged on the 21st of June, three days after its date. An inspection of the deed shows many erasures and interlineations. Among the latter are the words, "rights of Manasquan Beach remaining unsold," in the description of the premises intended to be conveyed. That the deed was altered after execution, is admitted by Samuel S. Osborn, in the answer.

The bill prays an answer on oath; that the Havens deed may be declared to be void, and the title of the complainants freed from the cloud which the record thereof casts upon it, and that Samuel S. Osborn and his wife, and any person holding under them or any purchaser from them, may be enjoined from setting up title against the complainants by virtue of the deed, or from

Havens *v.* Osborn.

using the deed or the record thereof as evidence of the title, or in any way interfering with the title and possession of the complainants, and that the cedar swamp, originally conveyed by the deed, may be decreed to belong to and be the property of the complainants, because of the fraud in the alterations and interlineations in the deed.

The bill alleges that Havens was in possession, in right of his wife, of the beach lands and swamp from the time of his marriage, in 1822, to his death, and that since then, the complainants, as his heirs-at-law, have been in possession thereof. The answer, on the other hand, denies that Havens or the complainants, or any of them, have been in possession of those premises or any part thereof since the conveyance by Havens to Osborn, and alleges that Abraham S. Osborn took full possession of the land and held it continually from the time of the conveyance up to his death, and that since his death the property has been in the possession of the defendants or some or one of them.

It is quite clear, from the evidence, that the beach lands in question have been in the possession of neither the one party nor the other since the Havens deed was made. At and ever since that time, up to a comparatively recent period, the land was of very little or no value; was used for no purpose by anybody, and was not enclosed, so that in determining the question presented in this cause, no aid is to be derived from the fact of possession since the making of the deed. As before stated, the answer on the part of Samuel S. Osborn admits that the interlineations and erasures which appear in the deed, were made after execution, but it alleges that they were made before acknowledgment and delivery. Judge Forman died, probably before this suit was begun, and Samuel S. Osborn is also dead. He died without giving any testimony in the cause. In the answer he makes the following statement: that he wrote the deed at its date (June 18th, 1845), and that Havens and his wife, at that date, signed it in the presence of Judge Forman, who then subscribed his name as a witness to its execution; that Havens and his wife then went away, leaving the deed unacknowledged and uninterlined, in his, Samuel S. Osborn's, possession; that

on the 19th or 20th of the same month, Havens came to the
storehouse of Abraham S. Osborn, and instructed him, Samuel
S. Osborn, to make the additions and alterations which appear
in the deed; that the change and additions were made in pursu-
ance of a bargain and agreement between his father and Havens;
that he was present when his father and Havens completed the
agreement of sale, and heard its terms and knows that the deed
correctly contains that agreement and the whole of it; that
that agreement, as finally consummated, was, that the considera-
tion named in the deed should be paid by his father and accepted
by Havens in full for the conveyance to the former, not only of
all the rights of cedar swamp, as called and known by the name
of Lawrence's Surveys, of or belonging to Havens and his wife,
but also of all their rights to Manasquan Beach, called and
known as Lawrence's Beach, and that "Lawrence's Surveys"
and "Lawrence's Beach," which he says is now known as Ma-
nasquan Beach, really included and embraced the rights of Ma-
nasquan Beach in controversy in this suit, all of which beach
rights were then of very little, if any, value. He further says, as
answering more in detail, that the agreement between his father
and Havens for the purchase of the land, was a verbal one;
that it was made in his presence, and that he was personally ac-
quainted with the whole matter; that the deed was drawn by
him, and correctly contained the agreement of purchase, and did
fully grant, bargain, sell and quit claim, for the consideration of
$5, as therein expressed, to his father all the rights of Havens
and his wife in cedar swamp, as known by the designation of
"Lawrence's Surveys," and that in fact the description, by its
very terms, embraced and included the rights of Havens and
his wife in Manasquan Beach, then yet remaining unsold; that
the deed was first signed by Havens and his wife and witnessed
by Judge Forman on the day of its date, but was not acknowl-
edged or delivered on that day, nor until the 21st; that on the
19th or 20th, at the storehouse of his father, in the presence of
his father and Havens, he suggested that it would be better to
expressly designate the beach rights on Manasquan in the deed,
and that thereupon Havens and his wife agreed, for the addi-

tional consideration of $5, which his father then agreed to give them, that such insertion should be made; that the consideration which the deed then expressed, $5, was changed by him to $10, and that then the insertions, erasures and interlineations, and each and all of them, were made in the deed in all respects as they now appear; that after they were made he wrote, in the presence of Havens and Judge Forman, over the signature of Forman, as the subscribing witness, the note that the interlineations and erasures in the deed were made before signature; that afterwards Forman took the acknowledgment of Havens and his wife (but not in his presence), and wrote and signed the certificate of acknowledgment on the deed; that before the delivery of the deed, and at the same time, his father gave to Havens $5 in cash, and a joint note of hand for $55, signed by his father and him, for the consideration named in that deed, and the amount of the consideration of another deed of conveyance, dated June 12th, 1845, made by Havens and his wife to his father (both deeds having been acknowledged on the same date), which note is produced; that the note was written by Forman and signed by his father and him when the deed was delivered by Havens and his wife; that the money and note were thereupon paid and delivered by his father to Havens, and accepted in full payment and satisfaction for the consideration of the deeds, and that Havens and his wife then delivered the deeds to his father, who took them away and retained possession of them until his death. And he adds that the deed in question was not recorded because his father did not think that the property thereby conveyed was of sufficient value to justify the expense.

It will be seen that not only is the alteration of the deed admitted, but it is also admitted that the note stating that the alterations were made before the deed was signed, was written by Samuel S. Osborn, over the signature of the subscribing witness, after the deed was executed. As has already appeared, all the parties to the conveyance are dead. The scrivener who drew it and the officer who took the acknowledgment are also dead.

On the part of the complainants, two witnesses, John C. Havens and Lydia Ann Havens (themselves two of the complain-

Havens *v.* Osborn.

ants), testify not only that the agreement for sale between their father and Osborn had reference only to the swamp land, but that they saw and read the deed, and also heard it read by Judge Forman to their mother before it was signed. They both testify that the deed was acknowledged on the same day on which it was signed. The former, John C. Havens, testifies that the agreement between his father and Osborn was verbal; that it was to the effect that the latter was to pay the former $10 for the cedar swamp, and his father agreed to take that sum for that land. That Samuel S. Osborn drew the deed, and Abraham S. Osborn handed it to the witness's father, who handed it to his daughter, Lydia Ann, and she took it into the house; that the deed remained in the house two or three days before it was acknowledged, and then Judge Forman came to the house and took the acknowledgment, and that it then remained in the house for three or four days longer, and until it was handed to Abraham S. Osborn by the witness's father; that it was never out of the house during that time; that it was executed and signed by his father at the same time it was acknowledged. That he (the witness) read a portion of it, and heard it read to his mother by Judge Forman; that the witness read the first page of the deed and saw that it ran about the cedar swamp and was in accordance with the agreement; that his father and mother and Judge Forman and his sister and himself were present when his father signed the deed; that it was read to his mother, and that the interlineations and erasures did not appear in it at that time. Lydia Ann Havens testifies that Abraham S. Osborn came to the house and brought the deed and left it to be acknowledged; that he gave it to her father and her father handed it to her; that some two or three days afterwards Judge Forman came and took the acknowledgment of the deed; that her father called to her to get the deed; that he was sitting at the table, and she got the deed and gave it to him; that she remained in the room while it was being executed; that it was opened and read to her mother, and that her father and mother both signed it; that Judge Forman asked her mother if she signed it without any threats or compulsion of her husband, and that he then finished writing; that

her father, mother, Judge Forman and her brother John and she were present when Judge Forman read the deed to her mother before it was signed; that she heard it read; that she read it herself after it was executed, and that after it was executed it was left at her father's house for a day or two, until it was given to Abraham S. Osborn by her father, when he was passing by, and that she read it the same day after it was acknowledged, before she left the room, and had it in her hands. She swears that it is the same except where it is defaced by the erasures and interlineations; that when she read it, it was a perfectly written document; that the interlineations and erasures were not there when she read it and when it was acknowledged; that it was in her possession from the time it was acknowledged until her father gave it to Abraham S. Osborn; that she saw her father deliver it to the latter; that she stood on the stoop and saw him hand it to him, and that at the time when the deed was delivered to Abraham S. Osborn there were no defacements or interlineations in the deed.

These two witnesses both swear that the deed did not, when it was acknowledged, contain the interlineations and other alterations now seen upon it. Of itself, this testimony is sufficient to overcome the answer of Samuel S. Osborn on the subject. That answer is further impeached, however, by the testimony of Robert Estell and Lydia Ann Havens, of conversations had by Samuel S. Osborn with them. Estell swears that in the summer of 1876 or 1877, he owned a piece of property on the beach, and applied to Osborn to survey it for him; that in their conversation, Osborn said to him that he thought there was quite a speculation to be made in buying up those beach rights (referring to the beach rights in what the witness calls the "Lawrence Lots"), and that if he, Estell, would buy up a lot of them, he would locate them; that he asked Osborn who had beach rights to sell, and he replied that Richard Borden's heirs had one-half of a seventh; that he asked him who the heirs were, and he said Joseph Borden and his sisters, and that Cortenius Havens's heirs owned one-seventh; Estell asked him where they lived, and he said that one of the boys lived in Brooklyn; Estell asked him if he thought, if he

should go to see him, he could purchase of him, and Osborn said that he thought he could; that his father had bought some property of Mr. Havens, and he could have bought this whole thing for $5 but did not think it was worth anything, and therefore did not buy it. Estell says that Osborn told him that if he would purchase a property he would locate it for him if he would give him one-half. He swears that Osborn told him that the Havens heirs owned one-seventh, and that he went to see them by reason of that conversation; and that the only way he knew that they owned the property, was from Osborn's statements to him on the subject.

Lydia Ann Havens testifies that in January, 1878, Samuel S. Osborn came to her house and said to her, " You know you own beach property, now it will soon come in market and will be valuable;" that she replied, " How will I know this?" and he said, " I will write and let you know." She also says that at that time he had access to the old papers of the family; that he was almost a day taking copies of their old deeds, and that he had four or five sheets of paper written full. She adds that Osborn said to her, referring to their rights in beach property, " When they come in market, don't sell them to any one else; give me the first refusal, as they join me, and don't let Estell have them anyhow."

The statements of Samuel S. Osborn in the answer in reference to the alterations in question, are inconsistent and contradictory in a very material respect. In his first statement he says that after the deed was executed, it was left with him, and that the next day or the next day but one afterwards, Havens came to the storehouse of his father, and there instructed him to make the additions and alterations which appear in the deed. In the other statement he says that he himself suggested that it would be better to expressly designate the beach rights on Manasquan in the deed, and that thereupon Havens and his wife agreed, for the additional consideration of $5, that the alterations should be made. In his first statement he substantially says that the alteration was made at the suggestion and by the direction of Havens; and in the other, that it was made on his own

suggestion, and that Havens and his wife only consented to it in consideration of the payment of a sum of money to them.

Where, as in this case, a deed is attacked on the ground that interlineations and erasures have been fraudulently made to the prejudice of the grantor, and the grantee admits that the erasures, alterations and interlineations were made by himself after the deed was signed and witnessed, and that he himself wrote the note above the signature of the subscribing witness, certifying that the alterations and additions were made before signing, and alleges that the alterations and additions were made with the knowledge and consent of the grantor, and the note with the knowledge and consent of the subscribing witness, the burden of proof is upon him. On the part of the defendants it is urged, however, as before stated, that the deed, as originally drawn, conveyed the property in question. The subject of conveyance originally stated in the deed, was—

"All our and each of our rights, titles, interests, estate, claims and demands, both at law and in equity, and as well in possession as in expectancy, of, in and to all our rights of cedar swamp, as called and known by Lawrence Surveys, as the one-half of two-thirds of one-seventh of fourteen-fifteenths, that was conveyed to David Curtis by Herbert Curtis" &c. (stating derivation of title); "also, one-third of one-seventh of fourteen-fifteenths, as conveyed" &c. (stating derivation of title), "together with all other of our rights of Lawrence's Surveys of cedar swamp to which the said Kortenius S. Havens and his wife have right by their father, John Curtis, and by virtue of his last will and testament, and to which he, the said John Curtis, by virtue of his father, David Curtis's, last will and testament, had good right, together with all and singular the hereditaments and appurtenances thereunto belonging."

The deed has been altered so that the words, "together with all other of our rights of Lawrence's Surveys of cedar swamps" &c., now read "together with all other of our rights of Lawrence's Beach and cedar swamps" &c. The defendants insist that the words "Lawrence's Beach and cedar swamps" are descriptive of land which embraced the tract in question, but it is evident from an inspection of the deed, that, as before stated, the words "Beach and" have been written over an erasure of the words "surveys of," and the letter "s" has been added to the word "swamp" in the same sentence. This clause in the deed not

only does not support the claim made by the defendants, but rather that made by the complainants; for the alteration just mentioned is one of those which are in question, and as the clause originally stood it confined the conveyance to land which was in Lawrence's Surveys of cedar swamp, and so was evidence of the intention of the parties to convey cedar swamp alone. But there is also cogent evidence of fraudulent alteration in the appearance of the writing of the deed. Samuel S. Osborn says in his answer, that the alterations were made 'either the next day after the deed was drawn, or the second day after, and the deed was drawn and executed nearly forty years ago. It is evident, from an inspection of the alterations in question, that they were made at a comparatively recent day, and were not made at or about the time the deed was executed. The note of the alterations made over the signature of the subscribing witness is a general one, and is as follows:

"N. B.—The interlining and erasures in this deed done before signing."

There were evidently some erasures in the deed at the time it was drawn, but they were words written by mere inadvertence, and undoubtedly erased as soon as written. The note for $55, given by Abraham S. Osborn and Samuel S. Osborn to Havens for and on account of the consideration of the deeds, has no weight as evidence.

I am constrained to adjudge that the alterations in the deed, so far as concerns the rights of Havens and his wife in Manasquan Beach, are fraudulent. There will be a decree accordingly, and that no estate, right, title or interest of Havens and his wife, or either of them, in the Manasquan Beach property was conveyed or passed by that deed, and that the defendants and all persons claiming under Samuel S. Osborn be perpetually enjoined from setting up or claiming any title to the property, under or by virtue of that deed, and the defendants will be required to pay costs.